**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )     **Criminal No. 1:18-cr-305** |
| MERGIA NEGUSSIE HABTEYES | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Defendant, Mergia Negussie Habteyes, was indicted by a federal grand jury on two counts

charging defendant with (1) procuring naturalization contrary to law, in violation of 18 U.S.C. §

1425(a), and (2) procuring naturalization to which he was not entitled, in violation of 18 U.S.C. §

1425(b). In essence, the Indictment alleges that defendant, who came to the United States as a

refugee in July 1999 and thereafter became a naturalized United States citizen in September 2008,

made false and material representations on forms and in sworn statements to immigration and

naturalization officials relating to his background in Ethiopia.[1] Specifically, the Indictment alleges

---

[1] Count 1 of the Indictment alleges that, in violation of 18 U.S.C. § 1425(a), defendant unlawfully procured naturalization by making materially false representations on his application for naturalization, including,

    (i) a representation that defendant had never persecuted any person because of political opinion, when in fact defendant had persecuted persons because of their political opinion;

    (ii) a representation that defendant had never committed a crime for which he was not arrested, when in fact defendant had committed grave willful injury, common willful injury, and assault, in violation of the 1957 Penal Code of the Empire of Ethiopia;

    (iii) a representation that defendant had never given false information to a United States government official while applying for any immigration benefit, when in fact defendant had falsely represented on his Application to Register Permanent Resident or Adjust Status that defendant had never committed a crime of moral turpitude for which he was not arrested; and

    (iv) a representation that defendant had never lied to any United States government official to gain entry or admission into the United States, when in fact defendant had falsely represented on his Sworn Statement of Refugee Applying for Entry into the United States that he had never participated in the persecution of any person because of political opinion.

Count 2 of the Indictment alleges that, in violation of 18 U.S.C. § 1425(b), defendant knowingly procured naturalization to which he was not entitled because at the time defendant applied for naturalization,

1

that defendant stated that he had never persecuted persons on the basis of political opinion, nor committed crimes for which he was not arrested, when in fact, according to the Indictment, defendant was an agent of the Derg, Ethiopia's then-ruling military council, and in that capacity he had persecuted and interrogated political opponents of the Derg at a prison known as Higher 3 in Addis Ababa, Ethiopia, during a period of time in the late 1970s known as "the Red Terror." According to the Indictment, the Derg waged a campaign of violence against political opponents, including the Ethiopian People's Revolutionary Party (the "EPRP").

Among the pre-trial motions filed by the parties is the government's motion *in limine* to admit a document into evidence pursuant to Rules 901(b)(8), 803(16) and 401, Fed. R. Evid. Specifically, the government seeks to introduce a document purporting to be a ledger reflecting the distribution of firearms and ammunition ("the Ledger") to Derg supporters during the Red Terror at Higher 3 prison in Addis Ababa, Ethiopia. Defendant opposes this motion on grounds of lack of authenticity, hearsay, and the danger of misleading the jury. For the reasons that follow, the government's motion to admit the Ledger into evidence in this case must be granted.

## I.

The facts recited here are derived from the testimony of two witnesses offered by the government to establish the authenticity, relevance, and non-hearsay character of the Ledger.

The government's first witness was Tadesse Metekia, the individual who found the Ledger and provided it to the U.S. Department of Justice. Metekia is a native of Ethiopia and is fluent in Amharic, one of the languages prominently spoken in Ethiopia. Metekia has a bachelor's degree

---

(i) defendant could not satisfy the requirements for naturalization under 8 U.S.C. § 1427 because defendant was not a person of "good moral character," given that defendant had given false testimony for the purpose of obtaining an immigration benefit, as alleged in Count 1 of the Indictment; and

(ii) defendant had previously obtained refugee status to which he was not entitled under 8 U.S.C. § 1101(a)(42), given that defendant participated in the persecution of persons because of their political opinion, as alleged in Count 1 of the Indictment.

in law from Hawassa University in Ethiopia, a master's degree in criminal law and criminology from the University of Groningen in the Netherlands, and a second master's degree in international crime and justice from the University of Turin in Italy. Metekia is also a Ph.D. candidate in the international criminal law program at the University of Groningen in the Netherlands and has conducted extensive research on the prosecution by Ethiopia's Special Prosecutor's Office ("the SPO") of individuals who participated in the Red Terror on behalf of the Derg during the so-called Derg trials. Additionally, Metekia previously served as a legal consultant to the Netherlands' Ministry of Justice and Security. In this post, Metekia located documents and other evidence introduced against Red Terror participants during the Derg trials, which Metekia provided to the Dutch government in connection with a Dutch prosecution of a Red Terror participant for the crime of genocide. Accordingly, the record warrants the conclusion that Metekia is knowledgeable about the Red Terror and the Derg trials and that Metekia has substantial experience locating and examining documents and records relating to the Red Terror and the Derg trials. Metekia's testimony on these subjects, summarized below, is therefore credible and reliable.

Metekia testified that during the late 1970s, the Derg, Ethiopia's ruling military council, launched a campaign of violent atrocities, known as the Red Terror, against political dissidents. Participants in the Red Terror detained, interrogated, tortured and executed the Derg's political opponents. After the fall of the Derg in 1991, the SPO was established in Ethiopia in 1992. During the 1990s, the SPO initiated a series of prosecutions known as the Derg trials, in which the SPO prosecuted Red Terror participants who had committed crimes of violence on behalf of the Derg.

In March 2017, the U.S. Department of Justice retained Metekia to provide research services in connection with this case. Specifically, Metekia was directed to search for records relating to a Derg trial conducted in Ethiopia in which "Mergia Negussie," the defendant here, was

3

a named defendant and for other documents that might reveal defendant's whereabouts and actions during the Red Terror period. At this time, Metekia already had in his possession certain court documents that Metekia had obtained from the archives of Ethiopia's Supreme Court, an appellate court, relating to a case the SPO had brought against Mergia Negussie *in absentia*. Because Ethiopian lower courts do not deliver all of the documents in a case to the Supreme Court, Metekia determined that it was necessary to look for additional documents in the Federal High Court, located in Addis Ababa, Ethiopia, where the SPO had initiated most of the Derg trials.

In the course of his search for documents relating to the Derg trial of defendant, Metekia visited a branch office of the Federal High Court where most of the files pertaining to the Derg trials were stored. At this branch, the archives clerk directed Metekia to a corner of the room where the Derg trial files were kept. Metekia looked through the files in this section and eventually found a file corresponding to the case brought by the SPO against Mergia Negussie. Metekia observed that documents in the file were organized in the same fashion as other Ethiopian court files. Specifically, the indictment, ruling, judgment and sentencing in the case were fastened to the left side of the folder and copies of the documentary evidence introduced in the case were fastened to the right side of the folder. One of the documents fastened to the evidence section of the folder was the Ledger.

The Ledger is a two-page handwritten document containing columns that list names of individuals, types of weapons, amounts of ammunition, and signatures. The name "Mergia Negussie" is listed twice in the first column of the Ledger. A header appears on each page of the Ledger that refers to the Revolutionary Campaign Coordinating Committee for Higher 3 ("the

RCCC").[2] According to Metekia, the RCCC was a division of the Derg government that supplied weapons to Red Terror participants and coordinated attacks against the Derg's political opponents. Metekia also explained that Higher 3 was a level of the Derg administration in Addis Ababa that also operated a prison in which Red Terror participants interrogated and persecuted political opponents of the Derg.

Metekia testified that the Ledger also bears an SPO stamp, which, according to Metekia, indicates that the document was filed in the folder pertaining to the Mergia Negussie case in accordance with the standard practice followed by the Ethiopian Federal High Court during the Derg trials. Specifically, according to Metekia, during the Derg trials, the SPO would bring to the Ethiopian Federal High Court the original item of evidence and a copy of the evidence bearing the SPO's stamp. The court would then verify that the copy was accurate and affix the stamped copy to the right side of the folder with the other evidence in the case. The SPO would retain the original item of evidence.

Metekia also made clear that handwritten dates appear in multiple places on the Ledger. Each of these date markings refer to the year 1970 of the Ethiopian calendar, which, according to Metekia, corresponds to about 1977 or 1978 in the Gregorian calendar.

Although Metekia had not previously seen a ledger of guns and ammunition in the course of his research, he testified that he had seen other handwritten Derg ledgers that were formatted in a manner similar to the Ledger and that, like the Ledger, also contained names and signatures. Metekia also testified that he observed nothing suspicious or unusual about the appearance of the

---

[2] During the course of his testimony, Metekia, who is a native of Ethiopia and fluent in Amharic, translated the portions of the Ledger that were written in Amharic.

Ledger. He also stated he was not aware of any instances in which Red Terror records were ever falsified for use against a defendant in the Derg trials.

The government's second witness at the evidentiary hearing on the admissibility of the Ledger was Special Agent Kathryn Menhart, a special agent in the Department of Homeland Security ("DHS") who interviewed defendant after his arrest in connection with offenses charged in the Indictment. Agent Menhart has been a special agent for approximately thirteen years and is a lead DHS case agent for defendant's unlawful naturalization matter. Agent Menhart testified as follows.

In the course of investigating defendant's case, Agent Menhart interviewed individuals who claimed to have been imprisoned in the Higher 3 prison in Addis Ababa, Ethiopia during the Red Terror. Agent Menhart testified that those individuals confirmed that the Higher 3 prison was a large villa or mansion that the Derg confiscated and used as a prison. These individuals also stated to Agent Menhart that they were imprisoned because they were thought to be members of political groups such as the EPRP that opposed the Derg regime. These individuals also claimed to Agent Menhart that during their imprisonment at the Higher 3 prison, they were interrogated and violently beaten.

Five of these individuals provided the identity of the persons who performed the alleged interrogations and beatings. All five of these individuals identified defendant as one of the persons who performed the alleged interrogations and beatings by providing defendant's first name, last name, or both and by identifying defendant either in an in-person lineup or in a photo array. At least some if not all of these individuals also claimed that defendant was armed with a gun at the Higher 3 prison. Some of these individuals also identified persons including "Worku Mengesha,"

6

"Hamelmal Mogus," "Nemrud Negash," and "Negede Abraham" either by first name, last name, or both, as persons who performed interrogations, beatings, and other abuse at Higher 3.

Defendant was arrested in connection with the charges alleged in the Indictment On August 17, 2018, at approximately 4:35 A.M., the time at which defendant typically left his home in the morning to go to his job at a parking garage, where he worked the early shift. Agent Menhart participated in defendant's arrest. After being Mirandized, defendant consented verbally and in writing to an interview with government agents, including Agent Menhart. The post-arrest interview lasted for about ninety minutes. From her interactions with defendant during his arrest and interview, Agent Menhart determined that defendant could capably speak and understand English. Defendant did not ask for an Amharic interpreter, nor was he provided with one. Agent Menhart conducted the interview in English and observed nothing to indicate that defendant did not understand what he was being asked or that defendant needed an interpreter.

During the interview, Agent Menhart showed defendant a copy of the Ledger in which the first of the two rows bearing the name "Mergia Negussie" in the first column was highlighted. Agent Menhart asked defendant if the name in the highlighted row was his name. In response, defendant confirmed three times that the highlighted name was his name.[3] Agent Menhart then asked defendant if the signature in the highlighted row of the Ledger was his signature. In response, defendant stated that the signature was his. After reading over the document for a brief period of time, defendant then changed his answer and stated that the signature was not his. Again, after attempting to retract his statement that the signature in the highlighted row was his, defendant confirmed that the name listed in the first column in the highlighted row was his name.

---

[3] *See* Government Ex. 6 at 67:21–68:6 (Agent Menhart: "Is this -- is this your name here that's highlighted?" Defendant: "My name. Yeah. Yeah. This -- the yellow one?" Agent Menhart: "Yes." Defendant: "Yeah." Agent Menhart: "That's your name?" Defendant: "Yeah. That's my name.")

Later in the interview, as defendant was examining the Ledger, defendant stated that his name was listed on the Ledger a second time, in the first column of a row several rows below the highlighted row. This additional row that defendant pointed out also bore the name "Mergia Negussie" in the Ledger's first column.

During cross-examination, counsel for defendant showed Agent Menhart defendant's Certificate of Naturalization, which defendant had signed in 2008, and defendant's Registration for Classification as a Refugee, which defendant signed in 1999. Agent Menhart, who noted that she has had no special training as a handwriting analyst, testified that defendant's signatures on the two immigration forms did not resemble the signatures appearing in the seventh column in the two rows in the Ledger that correspond to the name "Mergia Negussie."

On the basis of this testimony, the government argues that the Ledger is authentic pursuant to Rule 901(b)(8), that any hearsay contained within the Ledger is subject to the hearsay exception under Rule 803(16), and that the Ledger is relevant under Rule 401. Defendant argues to the contrary that the Ledger is neither authentic nor subject to a hearsay exception and that the Ledger's probative value is outweighed by the danger of misleading the jury.

## II.

The authenticity of a document simply refers to whether a document is in fact what it is purported to be. In the context of this case, the government seeks to authenticate the Ledger as a document reflecting the distribution of firearms and ammunition to Derg supporters during the Red Terror at Higher 3 prison in Addis Ababa, Ethiopia. Authenticity is a requirement of admissibility. Rule 901(a), Fed. R. Evid. Defendant objects to the admissibility of the Ledger on the ground that, in his view, it is not authentic. The government argues that the Ledger is authentic and presented evidence to that effect. To satisfy the requirement of authenticating an item of

evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.* The proponent's burden to show an item of evidence is authentic "is not high—only a *prima facie* showing is required." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). This is so because, as the Fourth Circuit has explained, "the factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Id.* Thus, at the motion *in limine* stage, "[t]he district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Id.*

In this respect, Rule 901(b)(8), Fed. R. Evid., provides that a proponent can authenticate an ancient document by producing evidence that the document (1) is in a condition that creates no suspicion about its authenticity; (2) was in a place where, if authentic, it would likely be; and (3) is at least twenty years old when offered. In this case, the government has adduced ample evidence to authenticate the Ledger as an ancient document under Rule 901(b)(8).

Metekia's testimony at the evidentiary hearing persuasively demonstrated that the Ledger is in a condition that creates no suspicion concerning its authenticity. First, Metekia, who has extensive experience studying Red Terror records, testified that he observed nothing suspicious or unusual about the condition of the Ledger. To the contrary, Metekia stated that he has encountered other handwritten Derg ledgers in the course of his research that were similar in appearance to this Ledger. Metekia also noted that it was significant that the Ledger bore the SPO's stamp, which, according to Metekia, indicates that the Ethiopian Federal High Court had verified that the stamped copy of the Ledger was an accurate copy of the original of the Ledger. In a similar vein, Metekia also stated that he is not aware from his research of any incidents of Red Terror records being falsified or fabricated for use against a defendant in the Derg trials. In addition, Metekia, a native

9

Ethiopian fluent in Amharic, testified that that both pages of the Ledger contained a heading that referred to Higher 3 and to a committee tasked with distributing weapons to anti-revolutionary allies of the Derg. The Ledger also lists numerous rows containing names, types of weapons, weapon numbers, and signatures. In other words, the contents of the Ledger itself support the government's assertion that the Ledger is a record of weapons and ammunition distributed at Higher 3 during the Red Terror. In sum, Metekia's testimony was persuasive and sufficient to demonstrate that the Ledger is in a condition that creates no suspicion as to its authenticity.

Metekia's testimony also demonstrated that he found the Ledger in a place where, if authentic, the Ledger would likely be found. In this regard, Metekia testified that he found the Ledger in a case folder stored in a branch of the Ethiopian Federal High Court where many of the Derg trials were prosecuted, specifically, in the corner of the archive room where all of the Red Terror-related cases were kept. Moreover, Metekia stated that the Ledger was affixed to the right side of a Red Terror case file among other documentary evidence submitted in that trial. In other words, Metekia found the Ledger in a folder of evidence admitted in one of the Derg trials among other similar case folders in an area of a judicial archive devoted to Red Terror cases. Clearly, it is likely that an authentic record of weapons and ammunition distributed to Derg agents at a Derg-operated prison during the Red Terror would be found in a prominent depository of records and evidence pertaining to the Derg trials concerning events that occurred during the Red Terror. This conclusion finds further support in the fact that Metekia, who has extensive experience locating Red Terror records from the archives of Ethiopian courts, testified that he would have expected to find the Ledger precisely where he did in fact find it. Indeed, that is why Metekia, an experienced researcher of Derg trial records who had previously collected Red Terror documents from Ethiopian courts for the Dutch government, decided to visit the Ethiopian Federal High Court's

archives to search for records and evidence connected to defendant's participation in the Red Terror. Thus, the government adduced sufficient and persuasive evidence to demonstrate that the Ledger was in a place where, if authentic, it would likely be found.

Finally, the government adduced ample evidence to demonstrate that the Ledger is more than twenty years old. First, Metekia, a native Ethiopian fluent in Amharic, testified that the Ledger contains multiple handwritten notations of dates that all refer to the year 1970 in the Ethiopian calendar. Metekia explained that this date in the Ethiopian calendar corresponds to 1977 or 1978 in the Gregorian calendar. Thus, as Metekia noted, these date markings reflect that the Ledger's contents were written in 1977 or 1978.

Second, Metekia also testified that the headings on each page of the Ledger refer to the RCCC at Higher 3, which reflects that the document was created and used by the RCCC at Higher 3. Because, as Metekia explained, the RCCC was a division of the Derg government, which collapsed in 1991, the document must have been created prior to 1991, more than twenty years ago.

Third, Metekia testified that he found the Ledger in an area of the Ethiopian court's archives devoted to Derg trial files among evidence introduced in one of the Derg trials prosecuted by the SPO. This too suggests that the Ledger was created and used during the period when the Derg was active because the Ledger was introduced as evidence in the prosecution of a Red Terror participant. Thus, Metekia's testimony persuasively established that the Ledger is more than twenty years old.

Accordingly, because the government adduced ample, persuasive evidence at the evidentiary hearing to demonstrate that the Ledger (i) is in a condition that creates no suspicion about its authenticity; (ii) was in a place where, if authentic, it would likely be; and (iii) is at least

twenty years old, the government has made the requisite showing under Rule 901(b)(8) to authenticate the Ledger as a record of firearms and ammunition distributed at the Higher 3 prison in Addis Ababa, Ethiopia during the Red Terror.

Of course, this conclusion does not preclude defendant from presenting contrary evidence and arguing to the jury at trial that the Ledger is not authentic. The ruling here that the Ledger is authentic simply permits the government to introduce the Ledger into evidence in this case, but this ruling does not bind the jury on the issue of the Ledger's authenticity. The burden at trial remains with the government to prove to the jury that the Ledger is what the government contends it is, namely a record of firearms and ammunition distributed at the Higher 3 prison in Addis Ababa, Ethiopia during the Red Terror. *See Vidacak*, 553 F.3d at 349; *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985).

Defendant opposes admitting the Ledger into evidence by advancing several arguments aimed at undermining the authenticity of the Ledger. Each of defendant's arguments fails to bar the admission of the Ledger on authenticity grounds.

First, defendant argues that the government did not show the Ledger is an authentic ledger of firearms and ammunition distributed during the Red Terror at Higher 3 prison because the government provided no evidence that the Ledger physically resembles other authentic weapons ledgers used by the Derg. This argument fails because defendant has pointed to no authority standing for the proposition that physical comparator evidence is necessary to authenticate an ancient document. To be sure, under Rules 901(b)(3) and (b)(4), Fed. R. Evid., a proponent of an item of evidence may authenticate the evidence through "comparison with an authenticated specimen" or through "distinctive characteristics of the item." But this is not the sole means of authenticating an ancient document; a proponent of an ancient document may instead elect to

authenticate the document under Rule 901(b)(8). And with regard to the physical appearance of an ancient document, Rule 901(b)(8) requires the proponent to demonstrate only that the condition of the document provides no reason to doubt that the document is what the proponent claims it is. Rule 901(b)(8)(A), Fed. R. Evid. Although a proponent of an ancient document certainly may introduce physical comparator evidence to help satisfy this requirement, such evidence is not required. As a leading treatise writer has explained, the key focus of the 901(b)(8)(A) inquiry is whether matters intrinsic to the document raise a suspicion that the document is not what it is purported to be; matters extrinsic to the document are only relevant insofar they raise suspicion about the document's authenticity. 31 Charles Alan Wright & Victor J. Gold, *Federal Practice & Procedure (Evidence)* § 7113 (2018).[4] In short, the absence of comparator evidence does not show that the Ledger is not authentic.

Next, defendant argues that the condition of the Ledger creates suspicion about whether it is a ledger of firearms and ammunition distributed during the Red Terror at Higher 3 prison. First, defendant points out that the Ledger contains several handwritten markings that appear in the margins of the document rather than inside the columns and other markings that are not written in the same direction as the handwritten entries within the form. This argument fails because it is not unusual for handwritten entries in a form to fail to conform with the form's boundaries. Thus, the fact that the Ledger contains messy handwritten entries does not raise a suspicion that the Ledger

---

[4] Defendant also raises a concern regarding whether the copy of the Ledger that the government seeks to admit is an accurate copy of the original document. Under Rule 1003, Fed. R. Evid., "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Here, defendant asserts that it is possible that alterations or additions were made to the copy of the Ledger. Such a bald assertion is utterly insufficient to raise a genuine concern about the accuracy of the copy the government seeks to introduce because defendant has provided only a hypothetical basis, as opposed to an actual basis, on which to conclude that the copy is inaccurate and therefore inadmissible. Moreover, as noted, Metekia testified that the SPO stamp that appears on the Ledger demonstrates that the Ethiopian Federal High Court verified that the copy of the Ledger stored in the court's evidence folder was an accurate copy of the original. Thus, to the extent that defendant argues that the Ledger is inadmissible because it is not the original version of the document, that argument fails.

is inauthentic. Second, defendant points to the final column of the Ledger, entitled "Signature," which defendant argues is too narrow to contain signatures.[5] As an initial matter, this argument is contrary to the testimony of Metekia, who confirmed that, indeed, the signatures column does in fact contain signatures. In any event, whether the markings in the signature column are signatures, initials, or some other kind of notation does not raise a suspicion concerning whether the Ledger is authentic because there is no reason to think that a wide variety of markings would not have been used in the Ledger to indicate that a weapon had been issued to an individual at Higher 3. Thus, defendant has failed to point to any aspect of the Ledger's condition that raises suspicion concerning the Ledger's authenticity.

Defendant also argues that the government failed to meet the second requirement under 901(b)(8) because the place where an authentic ledger of weapons and ammunition distributed at Higher 3 prison during the Red Terror would likely be found is at the Higher 3 prison or in a related administrative office of Ethiopia's prison system. This argument fails for two reasons. First, the Higher 3 prison no longer exists, and it is not at all clear that a ledger recording the distribution of weapons and ammunition to further the Derg regime's violent oppression of the regime's political opponents at a prison run by the regime would remain archived in Ethiopia's prison system after the Derg regime was unseated. It is far more likely that a ledger chronicling the distribution of weapons at a Derg prison would be found among trial records pertaining to cases in which Derg agents were prosecuted for crimes committed during the Red Terror. Second, and more

---

[5] Defendant also argues that the condition of the Ledger raises suspicion as to its authenticity because, according to defendant, the signature corresponding to "Mergia Negussie" does not match the defendant's signature. This argument fails because Rule 901(b)(8)(A)'s requirement that a document be free of suspicion "goes not to the content of the document, but rather to whether the document is what it purports to be." *United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir. 1986). Thus, whether the signature that appears in the Ledger is really defendant's signature is immaterial to whether the Ledger is admissible under the authenticity rule as an ancient document and rather goes to the weight of the evidence.

importantly, 901(b)(8)(B) does not require the proponent of an ancient document to show that the document was found at the one location where it is *the most likely* that an authentic document would be found. Rather, the Rule requires a showing that the document "was in *a place* where, if authentic, it would likely be." Rule 901(b)(8)(B), Fed. R. Evid. As discussed at length above, Metekia testified that the Ledger was found precisely where it would likely be, in an archive of the Ethiopian Federal High Court, which was an important depository of evidence and records pertaining to the prosecutions of Red Terror participants in the Derg trials. There is every reason to believe that a document such as the Ledger, which implicates the individuals named in the document as participants in the interrogation, persecution, and abuse of Derg opponents at Higher 3 during the Red Terror, would be found among evidence introduced against Red Terror participants in the Derg trials. In sum, defendant's claim that the Ledger was not found where it likely would be found is unpersuasive.

Finally, defendant argues that Metekia's testimony that the Ledger contains handwritten dates referring to the year 1970 in the Ethiopian calendar, *i.e.* approximately 1977 or 1978 in the Gregorian calendar, is not sufficient to show the Ledger is twenty years old because Metekia has no personal knowledge of when the Ledger was created. This argument fails for two reasons. First, there is no requirement that an ancient document be authenticated by a witness with firsthand knowledge of the document's creation or the origin of the document's contents. To the contrary, as one district court in this district noted,

> [the] argument that ancient documents can only be authenticated by someone with personal knowledge of their creation is ridiculous, as it would undermine the very purpose of the relevant exception, which recognizes and addresses the problems caused when firsthand witnesses die, recollections fade, and alternative tangible evidence is lost with the passage of time.

*In re Paysage Bords De Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*, 991 F. Supp. 2d 740, 747 (E.D. Va. 2014). Thus, Metekia, who testified that he is fluent in

Amharic, was fully competent to testify that the Ledger bore date markings referring to the year 1970 in the Ethiopian calendar. Second, in addition to the date markings, the government also adduced testimony by Metekia that the Ledger referred to the operations of Higher 3 and the RCCC, which both ceased to be active in 1991, and that the Ledger was found along with other evidence introduced during the Derg trials against participants in the Red Terror, which ended in 1991. This evidence provides further support for the conclusion that the Ledger was created more than twenty years ago because, as a leading commentator has noted, a document's reference to events contemporaneous with its creation and extrinsic evidence regarding the circumstances of the document's custody may be introduced to demonstrate the document's age for purposes of authenticating the document as an ancient document. *See* 31 Charles Alan Wright & Victor J. Gold, *Federal Practice & Procedure (Evidence)* § 7113 (2018). Thus, defendant is incorrect in arguing that the government has adduced insufficient evidence to demonstrate that the Ledger is more than twenty years old.

In sum, the testimony by Metekia demonstrated credibly and reliably that the Ledger is an authentic ancient document.

### III.

The conclusion that the Ledger is an authentic ancient document does not end the admissibility analysis, as defendant argues that certain entries in the Ledger constitute hearsay within hearsay and are not subject to any hearsay exception. To be sure, it is axiomatic that hearsay evidence is inadmissible unless a hearsay exception applies. Rule 802, Fed. R. Evid. In this respect, there is a hearsay exception under Rule 803(16), Fed. R. Evid., for statements contained in an authenticated ancient document. But importantly, under Rule 805, Fed. R. Evid., when a party seeks to introduce a document that contains hearsay within hearsay, any double hearsay statements

16

are inadmissible unless a hearsay exception applies to each level of hearsay. Accordingly, any statements in the Ledger that constitute "first-level hearsay" are admissible under Rule 803(16), but any statements in the Ledger that constitute hearsay within hearsay are inadmissible unless a separate hearsay exception applies.[6]

Thus, it is essential to determine here which statements in the Ledger constitute "first-level hearsay." In this respect, courts have held that statements within an ancient document constitute first-level hearsay if the statements are attributable either to the author of the document or to an individual who has adopted the contents of the document by signature. *Hajda*, 135 F.3d at 444; *Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 660010, at *3 (N.D. Okla. Feb. 1, 2018); *Kesey, LLC v. Francis*, No. CV. 06-540-AC, 2009 WL 909530, at *28 (D. Or. Apr. 3, 2009), *opinion adopted*, No. CIV. 06-540-AC, 2009 WL 1270249 (D. Or. May 5, 2009). A statement in an ancient document that was written by the author or adopted by the signing individual on the basis of personal knowledge is attributable to the author or signing individual, whereas a statement in an ancient document that quotes another declarant or was made on the basis of another declarant's statement is attributable to the outside declarant and constitutes hearsay within hearsay. *See, e.g., Beach Mart, Inc. v. L & L Wings, Inc.*, No. 2:11-CV-00044-F, 2016 WL

---

[6] It is true that lower courts have disagreed over whether Rule 805 applies to statements contained in ancient documents. *See Langbord v. United States Dep't of Treasury*, 832 F.3d 170, 189–90 (3d Cir. 2016) (citing cases). Yet, the two courts of appeals that have addressed the issue—the Third and Seventh Circuits—have both held that the ancient documents exception applies only to "first-level hearsay" statements within the ancient document and that under Rule 805 any hearsay within hearsay contained in the ancient document must satisfy an independent hearsay exception. *Langbord v. United States Dep't of Treasury*, 832 F.3d 170, 190 (3d Cir. 2016); *United States v. Hajda*, 135 F.3d 439, 443–44 (7th Cir. 1998). Although the Fourth Circuit has not addressed the issue, this Third and Seventh Circuits authority is persuasive because applying Rule 805 to statements contained in an ancient document is consistent with the rationale of the ancient document exception—namely, that statements in an ancient document are admissible because they are deemed to be reliable. *Langbord*, 832 F.3d at 190. As the Third Circuit has explained, double hearsay statements in an ancient document are not reliable because "[t]he author of the ancient document may have misheard or misunderstood the hearsay statement or his written words may not convey the meaning intended by the hearsay declarant." *Id.* (internal quotes omitted). Thus, the authority holding that Rule 805 limits the reach of Rule 803(16), the ancient document exception to the hearsay rule, is instructive on how to analyze the case at hand.

347398, at *5 (E.D.N.C. Jan. 27, 2016); *Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 806 (E.D. Tex. 2005); *United States v. Stelmokas*, No. CIV. A. 92-3440, 1995 WL 464264, at *6 (E.D. Pa. Aug. 2, 1995). Whether the statement was written by the author or adopted by the signing individual on the basis of firsthand knowledge may be inferred from the circumstances or may be apparent from the statement itself. *See Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 333, 337 (2003); *EnergyNorth Nat. Gas, Inc. v. UGI Utilities, Inc.*, No. CIV. 00-500-B, 2003 WL 1797946, at *1 (D.N.H. Apr. 3, 2003); Fed. R. Evid. 803 Advisory Committee's Note ("[The declarant's firsthand knowledge] may appear from his statement or be inferable from circumstances."); 2 McCormick on Evid. § 323 n.15 (7th ed. 2016); 5 Weinstein's Federal Evidence § 803.18 (2d ed. 2012).

The Seventh Circuit's opinion in *United States v. Hajda*, 135 F.3d 439, 444 (7th Cir. 1998), provides a useful illustration of these principles. The first ancient document in that case contained statements asserting that the defendant had served as an SS trooper in the German military. *Id.* at 443. Importantly, although the document was prepared by an unnamed government official, who may or may not have had personal knowledge of the factual basis of the statements in the document, the defendant's sister, who had firsthand knowledge of the defendant's wartime activities, signed the document and thereby adopted the statements in the document. *Id.* Accordingly, the Seventh Circuit concluded that the statements in the ancient document, that the defendant's sister adopted by her signature in the document, constituted only one level of hearsay. *Id.* at 444. The second ancient document in that case was a trial record that recorded a statement made orally by the defendant's father that the defendant served in the German SS. *Id.* at 443. In contrast with the first document, the father did not sign the trial record. Therefore, because the trial record merely recorded the father's statement and was neither signed by nor prepared by the father,

the document constituted two levels of hearsay. *Id.* at 444. Put another way, the statement in the trial record constituted hearsay within hearsay because the statement was attributable to an individual who had neither authored nor signed the document.[7]

The principles stated here and as applied by the Seventh Circuit in *Hadja* point persuasively to the conclusion that the contents of the four rows of the Ledger that the government seeks to introduce constitute first-level hearsay. The name "Mergia Negussie" appears in the first column of two of these rows, and the names "Nemrud Negash" and "Negede Abraham" each appear in the first column of one of each of the other two rows. In the five columns to the right of each of these names, information reflecting, *inter alia*, types of weapons and amounts of ammunition are listed. And importantly, at the end of each of these four rows, in the seventh column, the Ledger has been signed. Because these rows of the Ledger are signed, all of the statements appearing in each of these rows—specifically, the names of individuals, types of weapons and amounts of ammunition—have been adopted by the individual who signed the row in column seven, even if the signing party did not write down the information in the first six columns.[8] *See Hajda*, 135 F.3d at 444; *United States v. Demjanjuk*, No. 1:99CV1193, 2002 WL 544622, at *23 (N.D. Ohio Feb. 21, 2002). The question, then, is whether the statements in these four rows of the Ledger are attributable to the individuals who signed the rows or to some other declarant.

In this regard, the statements in each signed row of the Ledger are attributable to the individual who signed the row in the seventh column because it can be inferred that the signing individuals adopted the statements in the first six columns of the corresponding rows on the basis

---

[7] For an additional case addressing similar facts and reaching the same result, *see United States v. Demjanjuk*, No. 1:99CV1193, 2002 WL 544622, at *23 (N.D. Ohio Feb. 21, 2002), *supplemented*, No. 1:99CV1193, 2002 WL 544623 (N.D. Ohio Feb. 21, 2002), *and aff'd*, 367 F.3d 623 (6th Cir. 2004).

[8] This analysis applies equally to all headings and titles appearing on the Ledger because the information in these headings and titled is also adopted by the individuals that signed the Ledger.

19

of personal knowledge. This inference is warranted for two reasons. First, the signatures themselves are representations that the signing individual confirmed the statements in the preceding six rows were true on the basis of the signing individual's firsthand knowledge. *See* Fed. R. Evid. 803 Advisory Committee's Note (stating that firsthand knowledge "may appear from [the declarant's] statement"). Second, the appearance and nature of the Ledger show that the individuals who signed each of the rows in the Ledger had firsthand knowledge regarding the information in columns one through six. As already discussed, *supra* at part II, the Ledger appears to record the distribution of firearms and ammunition by the RCCC to Derg agents at Higher 3. And the final column, labeled "Signature," contains multiple signatures that are clearly the signatures of many different individuals.

The circumstantial evidence provided by the contents and appearance of the Ledger warrants the inference that the signatures were provided by the individuals receiving the weapons and ammunition from the RCCC.[9] Those individuals certainly would have had firsthand knowledge regarding the identity of the individual receiving the weapon and ammunition, the type of weapon received, and the amount of ammunition received. Therefore, the statements in each of the Ledger's signed rows are attributable to an individual who, with personal knowledge, has adopted the statements in that row by his signature. Accordingly, the statements in each signed row constitute first-level hearsay.[10]

---

[9] Indeed, as explained more fully, *infra*, there is direct evidence that at least one of the individuals who signed column seven of the Ledger was the same individual listed in column one of the corresponding row. Specifically, Agent Menhart testified that defendant admitted (i) that his name appeared twice in the first column of the Ledger, where the name "Mergia Negussie" is listed, and (ii) that defendant signed the first of these two rows, although he thereafter attempted to retract this admission.

[10] It is worth noting that the above analysis yields a different outcome for the small number of rows in the Ledger that are not signed in the seventh column. Because these rows are not signed, in order for the information in those rows to constitute first-level hearsay there must be evidence to warrant the inference that the statements appearing in the unsigned rows are attributable to the author of the statements. In this regard, the statements in the unsigned rows cannot be attributed to the author because there is insufficient circumstantial evidence from which to infer that the

In sum, the statements in each of the signed rows of the Ledger constitute "first-level hearsay" because the statements were adopted by individuals who signed the Ledger and because those individuals adopted the statements on the basis of firsthand knowledge and not on the basis of hearsay. Accordingly, the statements in each of the signed rows of the Ledger, which include the four rows that the government seeks to introduce, are covered by Rule 803(16), the ancient document exception to the hearsay rule, and are admissible for the truth of the matter asserted.

Alternatively, even if the statements in the Ledger constituted hearsay within hearsay, the statements contained in the first row pertaining to "Mergia Negussie" are not hearsay because the statements constitute an opposing party statement. Under Rule 801(d)(2), Fed. R. Evid., an opposing party's statement is not hearsay. A statement is considered an opposing party's statement if the statement is offered against an opposing party and, *inter alia*, the statement "was made by the party" or "is one the party manifested that it adopted or believed to be true." Rule 801(d)(2)(A)– (B), Fed. R. Evid. Because the question whether a statement was made by or adopted by the opposing party is a question concerning the admissibility of evidence under the hearsay rule, the court must decide that question for purposes of admissibility by a preponderance of the evidence. Rule 104(a), Fed. R. Evid.; *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

---

author wrote the statements on the basis of firsthand knowledge. It is unclear who wrote the information in the first six columns of the Ledger or more generally how such information was recorded. It is possible that the information appearing in the first six columns of each row was written contemporaneously with each corresponding distribution of weapons and ammunition by an individual with personal knowledge of the transaction. Yet, it is also possible that the individual or individuals who prepared the first six columns of the Ledger did not have firsthand knowledge of the transaction and that the "authors" of the first six columns recorded the hearsay statements of another declarant. In the absence of any circumstantial evidence regarding the process by which the information in the six columns was recorded, it cannot be inferred that the author or authors of the first six columns wrote the statements on the basis of firsthand knowledge. *See Beach Mart, Inc.*, 2016 WL 347398, at *5 (holding that a statement in an ancient document could not be attributed to the author because it was unclear whether the statement was made on the basis of another declarant's statement). Thus, because the statements in the unsigned rows cannot be attributed to the author of those rows, the statements constitute hearsay within hearsay and are not admissible under Rule 803(16).

Here, Agent Menhart testified that during defendant's post-arrest interview, defendant viewed the Ledger and, when asked, answered that the signature in the first numbered row of the Ledger, which lists "Mergia Negussie" as the name in the first column, was his signature. To be sure, defendant then attempted to retract his admission and stated that the signature was not his signature. But Agent Menhart testified that before defendant stated that the signature was not his, defendant appeared to read over the rest of the Ledger, albeit briefly. This evidence is sufficient to establish by a preponderance of the evidence that defendant signed the seventh column of the Ledger's first numbered row and thereby adopted the information recorded in the remainder of the row, including that his name was listed in the first column and that defendant was issued a weapon and ammunition.[11]

In response, defendant asserts that the signature that appears in the first row of the Ledger does not match the exemplars of defendant's signature that appear on defendant's two immigration forms. Specifically, defendant points to his signatures that appear on his Certificate of Naturalization and his Registration for Classification as a Refugee and argues that these signatures do not match the signature appearing in the seventh column of the first row of the Ledger. This argument fails for two reasons. First, defendant signed his Certificate of Naturalization in 2008 and his Registration for Classification in 1999. And as Metekia testified, the Ledger was used and signed in approximately 1977 or 1978, about twenty years before defendant signed the Registration for Classification as a Refugee and about thirty years before defendant signed the Certificate of Naturalization. It is not uncommon for an individual's signature to change over such long periods

---

[11] The finding that defendant signed the Ledger is made solely for the purpose of determining the admissibility of the Ledger for the truth of the matter asserted therein, namely, that someone by the name of Mergia Negussie received a weapon at the Higher 3 prison. But importantly, admission of the Ledger does not preclude defendant from arguing to the jury that the evidence does not warrant the conclusion that defendant signed the Ledger and that the jury should give little or no weight to the Ledger.

of time. Thus, the exemplars of defendant's signature appearing on these two immigration forms

are of little persuasive value. Second, the signature column on the Ledger is fairly narrow; it is

likely that many of the individuals who signed the Ledger used a more condensed marking, such

as their initials, to complete or fill out the signature field instead of writing a full signature. Thus,

contrary to defendant's argument, the signature exemplars on defendant's immigration forms do

not overcome the stronger, more persuasive evidence, namely, defendant's initial admission that

the signature appearing in the first row of the Ledger is defendant's.

Accordingly, even if the contents of the Ledger's various rows constituted hearsay within

hearsay, which they do not, the statements contained in the first row of the Ledger, corresponding

to "Mergia Negussie," are admissible because those statements were made by and adopted by

defendant, and therefore, pursuant to Rule 801(d)(2)(B), those statements are not hearsay.[12]

## IV.

Finally, admissibility requires relevance; evidence is "relevant" if "(a) it has any tendency

to make a fact more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action." Rules 401, 402, Fed. R. Evid.

The probative value of the Ledger is clear and is not insubstantial. Two rows of the Ledger

list defendant's name, "Mergia Negussie," as an individual that was present at Higher 3 prison and

that received a weapon there. Defendant himself confirmed that his name appeared in each of those

two rows. This fact is significant because it makes it more likely that defendant participated in

---

[12] The government also argues that the signatures appearing in the rows of the Ledger that do not correspond to "Mergia Negussie" are not hearsay because the government does not seek to introduce these signatures for the truth of the matter. Rather, according to the government, these signatures are relevant because they show that the individuals listed in the first column of the corresponding rows were at the Higher 3 prison and thus corroborate certain government witnesses' testimonies that defendant and these other individuals participated in beatings and interrogation at the prison. This alternative argument fails because this line of relevance would require the introduction of the signatures for the truth of the matter asserted by the signatures, *i.e.* that the individual listed in the first column was the individual that signed the document and that received the listed weapon and ammunition at the Higher 3 prison.

interrogation and beatings at Higher 3 during the Red Terror and thus that defendant's representation to government officials during his immigration process that he had not persecuted individuals on the basis of political opinion was false, as alleged in the Indictment. The Ledger also would corroborate the testimonies of certain government witnesses, who were allegedly victims imprisoned at Higher 3 prison, that defendant and two other individuals listed on the Ledger, "Nemrud Negash" and "Negede Abraham," participated in interrogations and beatings at the prison during the Red Terror and that defendant was armed with a gun. Thus, the Ledger is clearly relevant evidence.

Seeking to avoid this conclusion, defendant argues that even if the Ledger is relevant, it should be excluded because the Ledger is likely to mislead the jury. Under Rule 403, Fed. R. Evid., relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of," *inter alia*, "misleading the jury." In this respect, defendant argues that there is no evidence that the "Mergia Negussie" listed in the Ledger is the same person as defendant and accordingly the jury will have to speculate as to the meaning of the Ledger's contents. This argument fails because the question whether defendant is the individual named in the Ledger does not bear on whether the jury can understand what the Ledger purports to record. There is nothing misleading about what the Ledger's contents show—namely, that individuals named "Mergia Negussie," "Nemrud Negash," and "Negede Abraham," among others, were present at the Higher 3 prison and received weapons there. To be sure, the jury may draw the inference that defendant was the "Mergia Negussie" named in the Ledger, but defendant will have a full opportunity to convince the jury of the contrary through cross-examination and argument. Thus, because the danger of misleading the jury is slight and does not substantially outweigh the probative value of the Ledger, the Ledger should not be excluded under Rule 403.

**V.**

In sum, the government's motion *in limine* must be granted because the proffered document, the Ledger, is properly classified as an ancient document pursuant to Rule 901(b)(8) as the evidence shows the Ledger meets all the requirements of that rule. In addition, the evidence also warrants the conclusion that the four Ledger entries proffered by the government are admissible under Rule 803(16), the ancient document exception to the hearsay rule, and that, alternatively, the first row of the Ledger corresponding to "Mergia Negussie" is not hearsay because defendant initially admitted that he adopted the statements in that row of the Ledger by his signature. *See* Rule 801(d)(2)(B). Although defendant attempted to retract his admission that he signed the Ledger, his retraction came too late and is unpersuasive. Finally, the government has demonstrated that the Ledger is unquestionably relevant and its probative value is not substantially outweighed by the negligible risk of misleading the jury.

An appropriate Order will issue.

Alexandria, Virginia
December 18, 2018

T. S. Ellis, III
United States District Judge